**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MINNOTTE MANUFACTURING COR-PORATION, Respondent.**

**No. 13680.**

United States Court of Appeals Third Circuit.

Argued Dec. 21, 1961.

Decided Feb. 27, 1962.

Rosanna A. Blake, Washington, D. C. (Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Melvin J. Welles, Attorney, National Labor Relations Board, Washington, D. C., on the brief), for petitioner.

Vincent M. Casey, Pittsburgh, Pa. (Margiotti & Casey, Pittsburgh, Pa., on the brief), for respondent.

Before McLAUGHLIN, KALODNER and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

On this petition for enforcement of an order of the National Labor Relations Board the contested issue is whether substantial evidence on the record as a whole supports the Board's finding that the respondent, Minnotte Manufacturing Corporation, discharged its employee, Robert Pashel, because of his union activity.

■ The Board, approving and adopting all findings and recommendations contained in the intermediate report of its trial examiner, has found that the respondent employer violated Sections 8(a) (1) and (3) of the National Labor Relations Act, as amended, 29 U.S.C.A. §§ 158(a) (1) and (3), by coercing and improperly interfering with its employees in connection with a union campaign to organize its plant, and by discriminatorily discharging employee Pashel because of his role in the attempted plant organization. Before this court it is not seriously questioned that the record contains a substantial showing of improper interference by the employer with what proved to be an unsuccessful effort to organize its employees. However, the respondent vigorously insists that the record requires the conclusion that Pashel was discharged because of dissatisfaction with his work rather than because of objection to his union activity. We shall examine the record on this disputed point.

During 1960 the respondent employed some 35 workmen in its steel fabrication plant, among them Pashel, a welder with some 20 years of experience. The record shows that in July 1960 Pashel personally informed a representative of the United Steel Workers that the employees at the Minnotte plant were interested in unionization. Pashel thereafter arranged meetings of employees with a union organizer. He also obtained the signa-

tures of a number of employees on union authorization cards, upon the basis of which the union filed a representation petition with the Board. A closely contested election was held on August 29th. The union failed to win a majority vote. Less than two weeks later, on September 9th, Pashel was discharged.

Two items appear in the record concerning the employer's awareness of Pashel's union activity. One employee testified that a few days before the election William Minnotte, president and owner of the business, had asked him "is Bob Pashel still pushing for the union". Another employee testified that shortly after the election President Minnotte expressed himself as unable to understand why Pashel, to whom he had been kind, "would ever want to start a union in the shop". Despite this substantial evidence that management was aware of Pashel's union activity and concerned about it, the respondent urges that the record does not show that management knew that Pashel was playing a major role in the union campaign. From this it is argued that management would have no reason to single him out among the employees who favored unionization for reprisal. We think a finding of fact could reasonably be made that management was aware of Pashel's leading role in the campaign for unionization. President Minnotte's reference to Pashel as "pushing for the union" and to his wanting "to start a union" indicates an awareness that Pashel was an active rather than a passive unionist. Moreover, this was a small plant with its 35 employees rather evenly divided on the issue of unionization and with management actively opposing the union. In this setting the comments of the president of the company about Pashel's union activity provided a sufficient basis for a logical inference that management knew that Pashel had been a leader in the union campaign and that management was displeased by this activity.

On the other hand, Pashel had been involved in the unsatisfactory performance of certain work just before his discharge. On September 9th, he and three other welders completed the welding of certain roof trusses. An immediate inspection disclosed certain defective welds. Pashel was instructed to correct these defects and did so within an hour. At the end of that working day, a Friday afternoon, Pashel was given his pay for the week and was informed that he was "laid off". It was not until several days later, when he inquired about unemployment benefits for a period of temporary unemployment, that Pashel learned that he had been discharged, allegedly because of the above described bad welding, and not "laid off" in a temporary reduction of the work force.

All of the circumstances considered, the Board simply did not believe that the employer was telling the truth in stating this reason for discharging Pashel. Commenting upon the demeanor of the witnesses, the trial examiner characterized Pashel as "straightforward and direct" while management representatives testified in an "evasive and summary manner". Apart from demeanor and the strange discharge procedure, we think several other circumstances justified this disbelief. First, there was affirmative evidence that management had never before criticized the work of this admittedly experienced welder.[1] Indeed, there was testimony that Minnotte himself had referred to Pashel as a "good" though not an "A–1" welder. Next, the welding job in question had been accomplished over a two day period by four welders, of whom Pashel was the most experienced. No basis appears in the record for man-

---

1. In this respect the present case is quite different from N. L. R. B. v. Rickel Bros., Inc., 3d Cir. 1961, 290 F.2d 611, where over a period of many months, beginning long before any question of union activity arose, the employer had on numerous occasions discovered and complained of serious errors in the work of the subsequently discharged employee.

agement's alleged belief that Pashel had made the defective welds. To the contrary, the trial examiner credited Pashel's testimony that he had explained to the shop foreman that his welds "were right" and that the foreman in reply had stated his belief that the bad welds were not Pashel's. This testimony dovetails with the undisputed showing that Pashel was assigned to correct the defective work and did so within an hour. These circumstances make it almost incredible that management actually believed that this episode so reflected on Pashel's competency as to call for his dismissal. On the whole record it was reasonable for the Board to reject the stated reason for discharge as mere pretext. Compare N. L. R. B. v. Electric City Dyeing Co., 3d Cir. 1950, 178 F.2d 980, where this court sustained a Board finding of discriminatory discharge based on much weaker evidence of improper motivation.

■ We have not overlooked respondent's contention that the Board improperly imposed upon the employer the burden of proving that the discharge was for a proper reason, rather than requiring General Counsel to bear the burden of proving improper cause. Unquestionably, the law imposes this burden upon General Counsel. Miller Elec. Mfg. Co. v. N. L. R. B., 7th Cir. 1959, 265 F.2d 225; see N. L. R. B. v. Rockwell Mfg. Co., 3d Cir. 1959, 271 F.2d 109, 115. But we find no indication that the burden was shifted to the employer in this case. To the contrary, the intermediate report, as approved by the Board, contains an affirmative finding that it is "clear the matter of the defective welding of the roof trusses was used as a pretext to cover the illegal motivation that otherwise stands affirmatively shown by the record as a whole." Thus, it was the Board's finding that General Counsel had affirmatively proved his contentions as to the cause of discharge. Our analysis of the evidence has indicated that this finding had adequate support in the record.

The order of the Board will be enforced.