**V.I. NARCOTICS STRIKE FORCE, Petitioner**
**v.**
**JAY WATSON, Respondent**

**JAY WATSON, Petitioner, vs. NARCOTICS STRIKE FORCE,**
**Respondent**
**v.**
**PUBLIC EMPLOYEES RELATIONS BOARD)**
**(Successor of GOVT EMPLOYEES SERVICE COMM'N), Intervenor**

Civil No. 333/94, Civil No. 337/94

Territorial Court Of The Virgin Islands

Division of St. Croix

November 27, 2000

FREDERICK HANDLEMAN, ESQ., Assistant Attorney General, St. Thomas, Virgin Islands, *for Petitioner*

SCOTT BURTON, ESQ., Christiansted, St. Croix, Virgin Islands, *for Respondent*

LORIN KLEEGER, ESQ., Christiansted, St. Croix, Virgin Islands, *for Intervenor*

ANDREWS, *Judge*

## MEMORANDUM OPINION and ORDER

(November 27, 2000)

### Introduction

The V.I. Narcotics Strike Force (NSF) dismissed Jay Watson from employment. He appealed to the Government Employees Service Commission (GESC), who subsequently ordered his reinstatement without back pay. NSF now seeks judicial review of GESC's order. It claims that Watson was dismissed for unsatisfactory job performance and, as a probationary employee, he could not appeal his dismissal. Watson also seeks review of GESC's order. He claims that it erred by failing to award him back pay. The issues presented for review are:

1) Whether GESC's finding that Watson was terminated because he spoke with the FBI is supported by substantial evidence?

2) Whether GESC acted within its statutory powers or abused its discretion when it concluded that it had jurisdiction to hear Watson's appeal pursuant to 5 V.I.C. § 531;

3) Whether GESC acted within its statutory powers or abused its discretion when it concluded that Watson's speaking with the FBI was a non-merit basis for his termination thus warranting his reinstatement? and

4) Whether GESC abused its discretion when it concluded that Watson should not be awarded back pay since he was a probationary employee?

For the reasons mentioned below, this Court concludes that: A) GESC's finding that Watson was terminated because he spoke with the FBI is supported by substantial evidence on the record; B) GESC had jurisdiction to hear Watson's appeal; C) Watson's speaking with the FBI was a non-merit factor in his termination; and D) Watson should have been awarded back pay.

## Facts[1]

In May 1991, Jay Watson commenced employment with the V.I. Narcotics Strike Force (NSF) as an agent. NSF required Watson to serve a one-year probationary period. However, this period was extended for six (6) months to November 6, 1992 as part of a disciplinary action imposed on him for speaking with the Federal Bureau of Investigation (FBI).

In December 1991, the FBI invited several NSF agents to discuss a pending investigation of misconduct by NSF agent Willie Bourda. Watson and another agent, Achilles Tyson, complied with the request. Watson did not initiate any discussion with the FBI or reveal any NSF internal secret information unknown to the FBI. Consequently, on December 23, 1991, NSF suspended Watson for six (6) days, and Tyson

---

[1] The facts are a summary of those found by GESC, which appear in its Decision and Order dated March 2, 1994, supplemented with other facts in the record necessary for a full comprehension of the issues for review. All the facts are supported by substantial evidence on the record and are predominantly uncontested.

for (3) days, without pay. The stated bases for the suspensions were that the agents violated NSF Rules, Chapter III Sections B4 and C6 by speaking to the FBI without being subpoenaed or given authorization, and in contravention of specific orders by a superior officer. The NSF rules were not given to Watson until January 29, 1992. He testified he was unaware that the prohibition against discussing NSF business applied to discussions with federal law enforcement agencies.

In February 1992, Willie Bourda, Watson's supervisor, prepared a performance rating of Watson and NSF Acting Director Carl Jackson reviewed it. Watson received a poor rating. The Drug Policy Advisor did not review Watson's rating. Another agent, Esbond Degrasse, commenced employment with NSF around the same time as Watson. However, Watson and Tyson were the only agents that received performance ratings during April 1991 to April 1992, i.e., their probationary period.

By letter dated May 28, 1992, NSF terminated Watson effective June 16, 1992. The stated basis for his termination was unsatisfactory performance during his probationary period. No further explanation was given. However, GESC found that: 1) Watson was terminated because he complied with the FBI's request to speak with him; 2) His poor rating was a pretext and part of a plan to dismiss him; and 3) He was treated differently from other agents hired around the same time because of his voluntary cooperation with the FBI.

Watson had no drug enforcement experience when he commenced employment with NSF. During his probationary period, he received on-the-job training, but only minimal formal training. All the agents who worked with him indicated that they had no problem with his performance. NSF suspended, but did not terminate, two other agents, i.e., Tyson and DeGrasse, for their poor performance.

### Procedural History

On June 12, 1992, Watson filed an amended appeal of his termination with the Government Employees Service Commission (GESC), i.e., the predecessor of the Public Employees Relations Board. He alleged that his termination was based on non-merit factors and that the V.I. Narcotics Strike Force (NSF) discriminated against him. NSF moved to dismiss the appeal. It claimed that GESC lacked jurisdiction under 5 V.I.C. § § 530-531 since Watson was a probationary employee, and

since his appeal was not based on any enumerated non-merit factor. By order dated September 18, 1992, GESC concluded that Watson's probationary period was properly extended for six (6) months and that he was a probationary employee at the time of his termination. It further concluded that it had jurisdiction under Section 531. On March 2, 1994, GESC rendered its decision reinstating Watson without back pay. Both NSF and Watson filed the instant petitions for writ of review on April 5, 1994. This court held a hearing on the petitions on February 2, 1996 and took the matter under advisement.

## Legal Analysis

1) Basis for Termination

The V.I. Narcotics Strike Force (NSF) challenges the ultimate factual finding by the Government Employees Service Commission (GESC), i.e., Watson was terminated simply because he complied with a request by the Federal Bureau of Investigation (FBI) to speak with him. At the hearing in this matter, it argued that substantial evidence in the record establishes that Watson was terminated for unsatisfactory work performance, specifically insubordination, by:

 a. refusing to return NSF equipment after being requested to do so by his supervisor;

 b. refusing to respond to field calls; and

 c. communicating outside the NSF agency contrary to specific orders.

The pertinent issue is not whether substantial evidence exists in support of facts NSF asserts GESC should have found, but whether the facts found by GESC are supported by substantial evidence.[2] In making

---

[2] Furthermore, this Court finds that the facts asserted by NSF are not supported by substantial evidence. A review of the record reveals that the initial request to return NSF equipment appeared in Watson's May 28, 1992 Termination Letter. Ex. 200, Administrative Record (5/28/92 Termination Letter) filed 8/1/95. Thus his failure to return the equipment occurred after the decision to terminate him and could not serve as a basis for his termination. Secondly, nothing in NSF Director Carl Jackson's May 18, 1992 memorandum recommending Watson's termination, nor in Drug Policy Advisor Gaylord Sprauve's testimony mentions Watson's failure to return field calls as a basis for his termination. The third fact asserted by NSF, that Watson disobeyed specific orders, is addressed in the body of this opinion.

such a determination, this Court must uphold GESC's factual finding if supported by substantial evidence on the record. *Branch v. Bryan and GESC,* 1980 U.S. Dist. LEXIS 8957, 18 V.I. 54, 56 (D.C.V.I. 1980). This is so even if the record is susceptible to more than one inference, and even if this Court would make a different inference. *Government v. PERB,* 22 V.I. 12, 23 (D.C.V.I. (1986); *Turnbull v Holder,* 1974 U.S. Dist. LEXIS 5659, 11 V.I. 93, 98 (D.C.V.I. 1974). With these principles in mind, the Court determines whether to uphold GESC's finding.

GESC found that Watson was terminated simply because he spoke with the FBI. In this regard, the record reveals as follows:

1) By memorandum to the drug policy advisor dated May 18, 1992, Director Carl Jackson recommended Watson's termination. He based his recommendation on Watson's Employee Performance Report which Willie Bourda prepared in February 1992 for the six-month period ending October 19, 1991. Jackson stated that Bourda's evaluation showed Watson was generally unproductive, argumentative, immature in judgment, lacked fellow agent confidence, was experiencing financial difficulties, and was under investigation for leaking information to drug dealers. *See* Administrative Record (5/18/92 Memo from C. Jackson to Sprauve) filed 8/1/95. However, other agents testified they had no problems with Watson's performance.

2) Watson testified that Director Jackson was "steaming, using profanity" in a meeting relative to the agents talking to the FBI about Bourda. GESC Hearing Tr. 11/22/93, p. 55.

3) By memorandum dated May 28, 1992, Drug Policy Advisor Gaylord Sprauve terminated Watson from NSF. The only reason given was "unsatisfactory performance during your probationary period". Administrative Record (Termination Letter by G. Sprauve 5/28/92) filed 8/1/95.

4) At the GESC hearing, Sprauve testified that he terminated Watson for poor performance based on Jackson's recommendations and on Watson's February 1992 Performance Evaluation. GESC Hearing Tr. 10/28/93 pp. 50, 60-64. When pressed for details, Sprauve gave only two reasons for termination: a) Watson removed NSF's General File Book and copied a page without authorization; and b)

Watson went to the FBI and participated in an internal investigation in violation of NSF rules. *Id.* at 51. He further explained that NSF has written rules which specifically prohibit agents from going to other agencies without formal authority. Absent authorization, he continued, "we expect [agents] to deal with the hierarchy within the [NSF] and receive instructions as to what they should or should not do. Those are in our rules and regulations, and this is exactly what [Watson] violated and *this is where he was punished.*" *Id.* at 79-80 (emphasis added).

An analysis of the record indicates that NSF has posited conflicting reasons and has been less than straight-forward regarding the basis for Watson's termination. Director Jackson's reasons for termination appear questionable as they are based on an evaluation report which only reflects Watson's first six months on the job. Thus Jackson's termination recommendation completely ignores Watson's most recent seven-month performance. Secondly, the evaluation was performed by Willie Bourda in whose FBI investigation Watson participated. This casts doubt on Bourda's ability to perform an impartial evaluation. Thirdly, the report was not completed by Director Jackson and reviewed or approved by Advisor Sprauve as required by 3 V.I.C. § 27g(j). It was therefore contrary to law. Under these circumstances, GESC's finding that the poor evaluation report was a pretext and part of a plan to dismiss Watson is supported by substantial evidence on the record.

Drug Policy Advisor Sprauve, the ultimate authority within NSF and who terminated Watson, testified that he based his termination of Watson on Jackson's recommendation. However, Sprauve mentioned none of the details listed in Jackson's memorandum as his reason for terminating Watson. Instead, he said he terminated Watson because he removed an NSF General File Book and copied a page without authorization. Watson testified that he copied the page at Sprauve's request and was never told, warned, nor charged with improper removal of the book. The only other detail which Sprauve gave as a basis for terminating Watson was that he spoke to the FBI in violation of NSF rules. In sum, he testified that Watson was punished for violating NSF rules by talking to the FBI. Finally, Watson's speaking with to the FBI was particularly upsetting to Director Jackson. A review of the entire record thus reveals substantial evidence which supports GESC's finding that NSF terminated (i.e., punished) Watson simply for talking to the FBI.

 NSF concedes that one of the basis for Watson's termination was his talking to the FBI. It insists however, that Watson acted contrary to specific orders and was thus insubordinate. GESC did not find that Watson spoke with the FBI in contravention to specific orders. In his proposed disciplinary action memorandum, Director Jackson stated that he directed Watson not to discuss Bourda's investigation outside the office with anyone to include local and federal agencies. However, agent Achilles Tyson testified that NSF agents were never told not to discuss Bourda's case with the FBI or any other agency. Watson testified that Jackson indicated he did not want any information regarding Bourda's investigation out of the office, but did not mention speaking with other agencies. He said Jackson also told them that NSF was investigating the matter. Watson explained that NSF had previously cooperated with the FBI in other investigations. He had not received the NSF rules until January 29, 1992. Insubordination suggests intentional disobedience. Accordingly, on the record, there is substantial evidence to conclude, as GESC evidently did, that Watson was not specifically instructed not to speak to other law enforcement agencies about Bourda's case and therefore did not intentionally disobey any order by his superior.

2) GESC's Jurisdiction

NSF contends that GESC was without jurisdiction to hear Watson's appeal since he failed to specify one of the non-merit factors enumerated in 3 V.I.C. § 531(a). Watson counters that he need not identify one of the enumerated factors, but may assert any non-merit factor as a basis for jurisdiction. This Court concurs with Watson.

This Court must uphold GESC's assumption of jurisdiction over Watson's appeal if GESC acted within the limits of its statutory powers and did not abuse its discretion. *Branch*, 18 V.I. at 56. The applicable statute under which GESC asserted jurisdiction over Watson's appeal provides:

> ... No discrimination shall be exercised, threatened, or promised by any person in the government service against or in favor of any person in recruitment, examination, appointment, training, promotion, retention or any other personnel action, because of political or religious opinions or affiliations or because of race, national origin, or any other nonmerit factor.

82

3 V.I.C. § 531(a). The statute further provides:

> Any applicant or employee who has reason to believe that he has been discriminated against because of religious or political opinions or affiliations or race or national origin any personnel action may appeal to the Commission ... If the Commission finds that there was discrimination on any of the above nonmerit factors it shall order appropriate corrective action and its decision shall be final.

3 V.I.C. § 531(b). Both sections 531(a) and 531(b) appear under the heading "Discrimination on account of nonmerit factors; appeals" and deal with the same subject. As such they are in *pari materia* and must be construed together. Section 531(a) clearly prohibits employment discrimination based on the non-merit factors enumerated and *any other nonmerit factor*. Section 531(b) provides the means of redress to persons subject to such discrimination. If not read to vest jurisdiction in GESC to hear discrimination disputes based on any non-merit factor, employers could violate section 531(a) based on non-enumerated nonmerit factors and the affected employees would have no redress. This could not be the intent of the legislature. *See Upson v. Quetel*, 1984 U.S. Dist. LEXIS 16550, 20 V.I. 576, 577-78 (D.C.V.I. 1984) (rejecting Petitioner's argument that GESC may order corrective action only where employment decision based on one of specific enumerated factors, and emphasizing GESC's jurisdiction to hear discrimination disputes based on *any* non-merit factor). Thus, this Court holds that Section 531(b) vests GESC with jurisdiction to hear appeals based on the specific enumerated factors as well as *any* other non-merit factor.

■ In his appeal filed with GESC, Watson alleged that NSF discriminated against him by terminating him for a non-merit factor, i.e., meeting with FBI agents in connection with an investigation of NSF. Ex. 95, Amended Certified Record (Amended Notice of Appeal) filed 8/28/95. This was a sufficient basis to evoke GESC's jurisdiction under section 531(b). Accordingly, this Court finds that GESC acted within its statutory powers and did not abuse its discretion when it exercised jurisdiction over Watson's appeal.

3) Non-Merit Basis for Termination

NSF contends that GESC exceeded its statutory authority by making a policy determination that talking to the FBI is a non-merit factor upon

83

which to terminate an NSF employee. It maintains that Watson's conduct violates NSF rules and a superior's order. GESC's decision, the contention goes, is tantamount to setting NSF rules and procedures. NSF's contention is without legal merit.

NSF cites no authority which permits it to promulgate rules and regulations which carry the effect of law. Although it may set down in-house rules and procedures, as it did on June 1, 1990, such rules may not conflict with applicable law. Section 531(b) would prohibit the implementation of any rule which permits employment discrimination based on non-merit factors. GESC is vested with the statutory authority to decide whether an employee has been terminated based on a non-merit factor. 3 V.I.C. § 531(b). It is not a question of setting policy, it is one of deciding whether an employer's conduct is accordance with applicable law. This GESC can do and thus it acted within its statutory authority in deciding whether Watson's talking to the FBI was a non-merit basis for termination.

 The real issue is whether GESC abused its discretion in deciding that Watson's speaking to the FBI was a non-merit factor. The phrase "nonmerit factor" is not defined in Section 531(b). However, language in other portions of the same subchapter (i.e., Tests, Appointments, Promotions, and Dismissals) shed light on the matter. Subchapter IV provides that employee appointments and promotions in the classified service shall be made on the basis of "merit and fitness." 3 V.I.C. § 521. It also provides that tests for employment and promotion must be "of such character as to determine the relative fitness and ability of the person tested to perform the duties of the class of positions for which a list is to be established." 3 V.I.C. § 522(a). Lastly, Subchapter IV requires probationary employees to undergo a working test period. Department heads are then required to observe and report to the Personnel Director "as to the ability of the employee to perform satisfactorily the duties of the position." 3 V.I.C. § 527. These provisions indicate, and this Court thus holds, that the phrase "nonmerit factor" as used in Section 531(b) denotes a factor other than one which relates to an employee's fitness or ability to adequately perform the duties of their position.

It is difficult to fathom how merely speaking to the FBI relates to an agent's ability to perform their duties. Virgin Islands law requires NSF agents to cooperate with the FBI. It provides in pertinent part that:

The functions of [NSF] shall be limited to ... confer, consult and cooperate with government departments and agencies engaged in drug and narcotic law enforcement on local, federal and regional levels.

3 V.I.C. § 27g(c). Thus speaking with the FBI is in conformity with an agent's duties. NSF contends, however, that Watson's speaking to the FBI was a violation of NSF rules and thus cannot be a non-merit factor to terminate him. One NSF rule allegedly violated by Watson provides that agents may:

4. Not divulge or discuss official Narcotics Strike Force business except when necessary in the performance of duty under due process of law or the permission of the Drug Policy Advisor to the Governor or Director.

NSF Rules & Procs. Chapter III Section (B)(4). The other rule prohibits agent "insubordination or refusal to obey a lawful order from Supervisory Agents." NSF Rules & Procs. Chapter III Section (C)(6). Rule (C)(6) is inapplicable here as GESC and this Court have found that Watson was not insubordinate. With respect to Rule (B)(4), no violation has been established. There is no evidence that Watson divulged or discussed official NSF business with the FBI. The only conduct proven, is merely that Watson spoke with the FBI. Such conduct, standing alone, does not establish a violation of NSF Rule (B)(4) and does not relate to Watson's fitness or ability to perform the duties of an NSF agent.[3] n3 Accordingly, his termination for such conduct is a termination based upon an improper non-merit factor, and GESC did not abuse its discretion when it so found.

## 4) Back Pay

GESC decided not to award back pay to Watson since he was a probationary employee and his continued employment was uncertain.

---

[3] Even if Watson violated NSF Rule (B)(4), a single violation, by NSF own standards, does not merit termination. NSF Disciplinary Procedures suggest imposition of a 3-day suspension for the first such violation, a 10-day suspension for the second, and a 15-day suspension or dismissal for the third such violation. NSF Rules & Procs. Chapter 5 (NSF-41), p. 18. Failure to comply with its procedures suggests that NSF did not treat Watson in a fair and nondiscriminatory manner and therefore violated Section 531(a). This conclusion is buttressed by the fact that Watson was already disciplined for the very same conduct via a 6-day suspension.

Watson contends that GESC's decision punishes him, releases NSF from its wrongful conduct, and is thus erroneous.[4] The question, then, is whether GESC abused its discretion by deciding not to award back pay to Watson. This Court finds that it did.

The statute which vests GESC with jurisdiction to hear discrimination disputes based on non-merit factors provide:

> If [GESC] finds that there was discrimination in any of the above nonmerit factors it *shall* order appropriate corrective action ...

3 V.I.C. § 531(b) (emphasis supplied). Thus the narrow inquiry is whether reinstatement of Watson without back pay amounts to "appropriate corrective action." GESC determined that Watson was discriminated against when NSF terminated him based upon a non-merit factor. This wrong resulted in the natural and foreseeable consequence of loss of pay. Watson should not be made to bear the burden of his employer's illegal conduct. Thus the only way to completely correct the wrong against him is to award back pay.

The clear specific aim of Section 531(b) is to discourage employment discrimination based on non-merit factors. If GESC does not award back pay to probationary employees they find to be victims of improper discrimination, employers would have no incentive not to discriminate against such employees. They would bear no burden for their illegal conduct. Therefore, failure to award back pay to probationary employees undermines the purpose of Section 531(b).

To the contrary, the practice of awarding back pay to probationary employees helps to insure employer compliance with the non-discrimination provisions of Section 531. It also appropriately corrects the foreseeable consequences of the employer's illegal conduct upon the

---

[4] Watson aslo challenges GESC's conclusion that he was a probationary employee when terminated. This Court, however, is satisfied that Watson was a "new hire" when he commenced employment with NSF in May 1991 as ruled by this Court in Watson v. GESC, Slip Op. Civ. No. 492/92 p. 6, Terr. Ct. St.C. Nov. 20, 1992. Further, the record is clear that Watson's one-year probation was properly extended in accordance with the provisions of 3 V.I.R. & R. 452-161(b). His 6-month extension was requested by the NSF Director and approved by the Personnel Director on January 29, 1992. Accordingly, GESC did not abuse its discretion in concluding that Watson's probationary period was properly extended and that he was on probation when terminated. *See* Ex. 126-127 (Aff. of K. Andrews) Admin. Rec. filed 8/1/95.

victim employee. Lastly, it would be consistent with GESC's decision in at least one other similar....

## Conclusion

For the foregoing reasons, this Court concludes that: 1) GESC's finding that Watson was terminated because he spoke with the FBI is supported by substantial evidence in the record; 2) GESC acted within the limits of its statutory authority and did not abuse its discretion when it assumed jurisdiction over Watson's appeal; 3) GESC did not abuse its discretion in concluding that Watson's speaking with the FBI was a non-merit factor in his termination; and 4) GESC abused its discretion when it decided not to award back pay to Watson.

## ORDER

For the reasons mentioned in the foregoing Opinion, it is hereby ORDERED that the Public Employees Relations Board's (GESC's) decision, dated March 2, 1994 in this matter is AFFIRMED to the extent it orders Watson's reinstatement, and is VACATED to the extent it denies Watson a back pay award, and it is further

ORDERED that this matter is REMANDED with directions to AWARD BACK PAY to Watson forthwith from June 16, 1992 to date of his reinstatement.